# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Rachel Hiskes
Omar Silva-Meléndez

    Plaintiffs

v.

José Figueroa Sancha, Superintendent of the Puerto Rico
Police Department, in his personal capacity;

José A. Rosa Carrasquillo, Associate Superintendent of the
Puerto Rico Police Department, in his personal capacity;

Miguel Mejías-Cruz, Commander of the San Juan Area of
the Police Department, in his personal capacity;

Héctor Figueroa-Torres, Director of the San Juan Tactical
Operations Unit of the Police Department, in his personal
capacity;

José Rohena-Sosa, an employee of or contractor with the
Legislature of Puerto Rico, in his personal capacity;

PRPD Agents represented by the fictitious name
FULANO, who were on the scene of the events of June 30,
2010 at the Capitol, in their personal capacities;

PRPD Agents represented by the fictitious name
SUTANO, who had supervisory responsibilities with
respect to the officers who were on the scene of the events
of June 30, 2010 at the Capitol, and who may or may not
have been on the scene of the events of June 30, 2010 at the
Capitol, in their personal capacities.

    Defendants

Civ. Number 10-

JURY TRIAL
DEMANDED

## COMPLAINT

**TO THE HONORABLE COURT:**

**NOW COME THE PLAINTIFFS**, through the undersigned attorneys, and respectfully allege and pray as follows:

## I. INTRODUCTION

1.1 This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fourth, Fifth and/or Fourteenth Amendments to the United States Constitution, as well as under the Constitution and laws of Puerto Rico, for the violence wrought against plaintiff Rachel Hiskes, a former University of Puerto Rico graduate student and journalist, and plaintiff Omar Silva-Meléndez, a musician and member of the group Cultura Profética, during a police riot which took place near the Capitol building in Puerto Rico on June 30, 2010, in which the civil rights of citizens were brutally violated.

1.2  Both of the plaintiffs suffered grave injuries as a result of an action by agents of the Puerto Rico Police Department, sponsored, planned and executed by defendants José Figueroa- Sancha, José A. Rosa-Carrasquillo, Miguel Mejías-Cruz and Héctor Figueroa-Torres, as well as by other PRPD officers identified herein by the collective fictitious names "FULANO" and "SUTANO," whose identity is unknown at this time, in order to repress legitimate First Amendment activities through the use of excessive force by police officers.

1.3 Plaintiff Rachel Hiskes, was also directly injured by the actions of José Rohena-Sosa, an employee and/or contractor of the Legislature of Puerto Rico, who participated in the refusal to allow her to exercise fundamental First Amendment rights and also took it upon himself to commit acts of aggression against her when she was attempting to

2

exercise her right to observe legislative proceedings and to report upon the same.

1.4  It is alleged that the officers named herein with the fictitious name of FULANO whose true identity is unknown at this time,  used excessive force and caused grave injury to both plaintiffs.  It is further alleged that these actions were taken under the direction and pursuant to instructions by the named defendants and due to the supervisory failings of other officers named herein with the fictitious name of SUTANO, whose true identity is unknown at this time.


## II. JURISDICTION

2.1  This action is brought pursuant to 42 USC §1983 and 1988 and the First Fourth, Fifth and/or Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28 USC §§1331 and 1343 and the aforementioned statutory provisions. Plaintiffs further invoke the supplemental jurisdiction of the Court pursuant to 28 USC §1367 to hear and decide claims arising under the laws of Puerto Rico and any related claims which are deemed to have been brought on behalf of pendent parties.

2.2 This is the proper venue to bring this action, since the cause of action arose in Puerto Rico and all parties reside in this jurisdiction.

2.3 There is also jurisdiction pursuant to 28 USC §1367 to hear any and all claims under the Constitution and laws of Puerto Rico which arise from the same nucleus of operative facts.

### III. PARTIES

_____3.1 Plaintiff Rachel Hiskes is currently a social worker who is a resident of the State of Connecticut.  Between 2007 and 2010, she was a graduate student in social work at the University of Puerto Rico, where she obtained a Master's Degree in 2010.  During the first half of 2010, Ms. Hiskes also worked as a journalist, covering events in Puerto Rico for the Rumbo Alternativo, a digital periodical.

3.2  Plaintiff Omar Silva-Meléndez is a resident of San Juan, Puerto Rico.  He is a founding member of the musical group Cultura Profética for close to fifteen (15) years.  He is a graduate of the High School of the University of Puerto Rico and the University of Puerto Rico.

3.3  Defendant José Figueroa-Sancha, a former agent of the Federal Bureau of Investigations (FBI). has been the Police Superintendent of the PRPD since early 2009.  As such, he is the Chief Executive Officer of the PRPD, with supervisory authority over some 17,000 agents and the authority to issue and implement general and special orders governing such matters as police discipline and strategic operations.

3.4  Defendant José A. Rosa-Carrasquillo is one of only some seven (7)  PRPD officers who have obtained the highest rank of Colonel.  At all times relevant to these events, defendant Rosa-Carrasquillo has been the Associate Superintendent of the PRPD, the second in command in the agency, charged with implementing all general and special orders governing such matters as police discipline and strategic operations and is  the chief executive officer in charge of the agency when defendant Figueroa-Sancha is absent.

4

3.5. Defendant Miguel Mejías-Cruz was at all relevant times the Commander of the San Juan Region ("Area") of the PRPD and as such the highest official in the Area and charged with implementing all general and special orders governing such matters as police discipline and strategic operations in the Area, in close collaboration with defendants Figueroa-Sancha and Rosa-Carrasquillo.

3.6 Defendant Héctor Figueroa-Torres was at all relevant times the director of the San Juan Tactical Operations Unit of the PRPD, and as such in charge of all matters related to police discipline in that unit and strategic operations involving unit officers.

3.7 Defendant José Rohena-Sosa is an employee or a contractor of the Senate of Puerto Rico.

3.8 The defendant or defendants identified with the fictitious name FULANO are agents of the PRPD, including but not limited to agents of the division known as the Tactical Operations Unit and the so-called "Group of 100," who were present on the scene at the Capitol building on June 30, 2010, and whose actions and omissions on the scene resulted in the injuries to the plaintiffs.  Their identities are unknown at this time, in part due to the failure of defendants Figueroa Sancha, Rosa Carrasquillo, Mejías-Cruz and Figueroa-Torres, as well as the defendants identified with the fictitious name SUTANO, to conduct a serious investigation into the violent actions of the PRPD that day.

3.9  The defendant or defendants identified with the fictitious name SUTANO are supervisors in the PRPD, including but not limited to supervisors in the division known as the Tactical Operations Unit and the so-called "Group of 100," who were either present

5

on the scene of the police riot on June 30, 2010, and/or who supervised those present on the scene or participated in the planning of the police mobilization on that day, and whose actions and omissions on the scene resulted in the injuries to the plaintiffs. Their identities are unknown at this time, in part due to the failure of defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres to conduct a serious investigation into the violent actions of the PRPD that day.

3.10  At all times relevant to this complaint, all defendants were acting under color of the law of the Commonwealth of Puerto Rico.

3.11  Each of these defendants is sued in his/her personal capacity.

## IV. <u>FACTUAL ALLEGATIONS</u>

### <u>The history of police violence in Puerto Rico - in particular the Tactical Units</u>

4.1 As early as 1967, the Civil Rights Commission of the Commonwealth of Puerto Rico issued a Special Report regarding civil rights violations by the PRPD, emphasizing that police violence was common in Puerto Rico.

4.2  The Tactical Operations Unit (*referred to hereinafter as "UOT"*) was first formed in 1973 through General Order 73-4.

4.3   Commonly known in Puerto Rico as the "Fuerza de Choque," (Shock Force), its primary mission is purportedly crowd control.

4.4  On many occasions since it was first formed, the UOT has engaged in proven violations of civil rights.

4.5 A few of the examples of violent attacks against citizens perpetrated by members

6

of the UOT, which have been addressed in cases before this court, are the following:

a. The beating death of Rembert Zambrana-Rodríguez in June of 1993, at the hands of two agents of the UOT. *See, Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122 (1ˢᵗ Cir., 1999);*

b. The participation of the UOT in a number of violent acts against citizens in the context of a strike against the Puerto Rico Telephone Company in 1998, in which at least two journalists were injured. *See, eg. Andreu v. Comas-Valle, Civ. No. 99-1669.*

c. An incident in March of 2007, in which members of the Tactical Operations Unit of Ponce "stormed into the neighborhood and began spraying pepper gas," after having been called to the area to make an arrest, in which UOT agents were alleged to have thrown a young child to the ground without provocation and to have struck the girl's mother with his club when she tried to intervene, fracturing her leg.   *Cruz-Santiago v. Alvarez-Boneta, Civil No. 1311;*

d. The incident in August, 2007, when a squad of UOT officers assaulted an attorney who was monitoring a protest at a parking building in San Juan as an observer for the Bar Association, as well as several other protesters. *See, Brenes-Laroche v. Toledo-Dávila, Civ. No. 08-1815;* and

e. The August, 2007 murder of Miguel A. Cáceres-Cruz, at the hands of a UOT agent, which was captured on videotape and which a former PRPD Superintendent characterized as an "assassination." *See, Ramírez v. Pagán, Civ. No. 08-1486.*

4.6  Also documented are several cases in which members of the UOT were alleged to have committed acts of violence in the midst of a "take-over" of housing projects.  One

such instance is alleged to have taken place in October of 1996, in the Jardines de Berwind Housing project when UOT agents are alleged to have used excess force in beating residents and in denying them needed medical assistance. *See, Gualdarrama v. Rivera-Ortiz, Civ. No. 97-2481.*

4.7 Tactical Operations officers also were involved in an incident in August of 2009 when more than 100 agents arrived at an area frequented by students, armed with batons, pepper gas, tear gas and Tasers or similar electrical devices and indiscriminately attacked students, and in which a student who was in a residence hall was hit by a tear gas cannister and had her leg severely injured.

4.8. Key supervisors within the PRPD, including defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, are aware of the need for UOT agents to be elite officers with a proven ability to control their emotions and to maintain discipline.

4.9 Defendant Figueroa-Torres has stated publicly that these officers are elite members of the UOT who must need to have tolerance for difficult and stressful situations. He has affirmed that such officers are investigated thoroughly before being assigned to the unit and that before each "mission," they are interrogated to assure that they can adequately handle the particular situation.

4.10 The aforementioned statements by defendant Figueroa-Torres were deliberately misleading.

4.11 Defendant Figueroa-Torres, as well as the other high-level supervisors in the PRPD, including defendants Figueroa-Sancha, Rosa-Carrasquillo and Mejías-Cruz, as well

8

as those officers identified with the fictitious name of SUTANO, are aware of the previous incidents of unprovoked violence by officers of the UOT and of the reputation that the Tactical Operations Unit has for engaging in unprovoked violence against citizens,

4.12 Shortly after he began his tenure as Superintendent of Police, defendant José Figueroa-Sancha, signed General Order 2010-2 for the purpose of creating another purportedly elite group of officers, known as the "Grupo de Cien" (Group of 100), a specialized Tactical Operations Unit, known as the Special Tactical Unit, or "U.T.E."

4.13 According to government sources the Group of 100 was an initiative with the purported purpose of having multidisciplinary teams, from several different police units — drug, traffic, stolen vehicles and the UOT, to impact upon the drug trade in Puerto Rico.

4.14 Since the Group of 100 was formed, it has worked closely with the UOT with respect to its work on "crowd control," and has also developed a reputation for actions of unprovoked violence against citizens.

**The failure of the PRPD to take action against officers who violate civil rights**

5.1. In September of 2007, after several incidents had occurred in which citizens had been killed by police officers, the then Governor of Puerto Rico established a Committee to conduct an external evaluation of the problems of violence and corruption in the PRPD. (External Evaluative Committee on the Police of Puerto Rico, *hereinafter "Evaluative Committee."*)

5.2. The Evaluative Committee concluded that there was a pattern of violation of civil rights by members of the PRPD, which had produced an almost complete loss of

confidence in the PRPD among citizens in Puerto Rico, as well as adverse effects on the morale of those officers within the PRPD who respect the rights of citizens.

5.3. The Evaluative Committee made a number of recommendations geared towards preventing police violence and towards improving the disciplinary system.

5.4. It is believed and therefore alleged that the supervisory officers who are defendants herein — defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz, Figueroa-Torres, and those defendants identified with the fictitious name SUTANO, have taken no action to implement any of these recommendations as to those matters over which they have authority.

5.5. The failures and delays in the disciplinary system in the PRPD serve to encourage violent action on the part of PRPD officers, since there is little fear of effective discipline against them.

5.6. Defendant Figueroa-Sancha, as PRPD Superintendent, has the power to issue General and Special Orders which would improve the disciplinary system in the PRPD and assure that errant officers are properly punished.

5.7. Defendant Figueroa-Sancha is aware of the failures and delays in the disciplinary system in the PRPD, but has failed to take any action to improve the system, to guarantee that citizens feel confidence in the system or to assure that errant officers are properly disciplined.

5.8. The failure of defendant Figueroa-Sancha to take action to improve the disciplinary system encourages violent actions on the part of officers, particularly those in

the "Shock Force," (the UOT and the Group of 100) to engage in violence against citizens, without fear of being subject to appropriate discipline.

**The events leading up to the incidents at the Capitol on June 30, 2010**

6.1. During the months between April and June of 2010, students at the University of Puerto Rico were on a strike, protesting *inter alia* unilateral decisions of the university administration which would adversely affect and threaten the financial ability of many students to attend the public university.

6.2. While most of the protests during the strike took place at the University itself, on May 20, 2010, a number of students also protested at a local hotel where the Governor of Puerto Rico was holding a fundraising event.

6.3. The UOT and/or the Group of 100 were dispatched to the protest and proceeded to assault citizens who were peacefully manifesting their disagreement with government policies.

6.4. The police officers on the scene began striking indiscriminately at the non-violent protesters, firing pepper spray or other noxious agents at some of them.

6.5. At that time, a protesting university student who was peacefully making known his views, when he was forced to the floor by several officers and was shocked several times by a Taser or similar instrument.

6.6. After the student was completely immobilized both by the officers and by the shocks he had received, defendant Rosa-Carrasquillo, who was present on the scene, proceeded to kick the student in the area of his genitals.

11

6.7. Photographs which appeared in the media showing this entirely unwarranted and illegal assault by the second-in-command of the PRPD against a peaceful protester.

6.8 In light of this incident, several legislators, elected Representatives, called for the ouster of defendant Rosa-Carrasquillo.

6.8. Despite his knowledge of the unprovoked assault by Rosa-Carrasquillo, defendant Figueroa-Sancha took no action to discipline defendant Rosa-Carrasquillo.

6.9 Defendant Figueroa-Sancha later defended the actions taken by defendant Rosa-Carrasquillo.

6.10 Without conducting any investigation, and despite the video and photographs of the incident which demonstrated that PRPD officers, including defendant Rosa-Carrasquillo, had engaged in excessive force, defendant Figueroa-Sancha called the agents "heroes."[1]

6.11. Through the aforementioned actions on May 20, 2010, and through the public statements they made thereafter, both Figueroa-Sancha and Rosa-Carrasquillo effectively communicated to other officers in the PRPD, including officers in in the UOT and the Group of 100, and the other defendants in this action, that unprovoked violence against protesters was not only permitted, but also encouraged.

6.12. The police actions of May 20th, in which several persons were injured by members of the PRPD and during which defendant Rosa-Carrasquillo gratuitously added

---

[1] The term "heroes" is a charged term with respect to police violence in Puerto Rico, was also used in th 1970's to describe PRPD officers who later were determined to have conspired to murder two young independence supporters. *See*, *eg.*, *Moreno-Morales*, *334 F.3d 140 (1st Cir., 2003)*

to the violence by his unprovoked assault against a helpless citizen, served to send messages to the PRPD in general, and to members of the UOT and Group of 100 in particular, that  this kind of violence against protesters was viewed with approval at the highest levels of the PRPD.

6.13. Shortly after the incident at the hotel described above, an accord was reached between the students and the University administration to end the strike.  The agreement was ratified by all campuses of the University system by June 21, 2010.

6.14  Immediately thereafter, the Legislature of Puerto Rico approved a series of measures, including an increase in the number of members of the Board of Trustees of the University, which many in the community interpreted as being contrary to the spirit, if not the letter, of the accords.

6.15.  On June 24, 2010, amid a climate of considerable tension, a photojournalist was expelled from the legislative chambers.   This expulsion was widely condemned by different sectors of the public and by press groups.

6.16. Shortly thereafter, the President of the Senate of Puerto Rico ordered the complete closure of the legislative chambers to both the press and to the public at large, provoking a series of lawsuits before the courts of Puerto Rico, including one brought by a Senator from the opposition party and another brought by members of the media.

6.17. In response to the public outcry, the Senate President issued a notification on June 29, 2010, the second to last day of the legislative session which was to finish on June 30th.  Pursuant to the notification, the press and the public were purportedly permitted

13

access to the Senate chambers.  Access to the Senate by members of the media was conditioned on verification of their credentials and the receipt of advance permission to have interviews with members of the legislative body.

6.18.  All of the above was discussed amply in the public media in Puerto Rico in the days leading up to June 30, 2010.

## The police riot of June 30, 2010 and the assaults against Ms. Hiskes and Mr. Silva

7.1  In response to the situation described above, at least three different demonstrations were planned to take place on the 30th of June, 2010, the last day of the controversial legislative session.

7.2   In the early afternoon hours, several legislators, elected Representatives preforming legislative functions at the Capitol  observed that members of the UOT and of the Group of 100 had already arrived at the Capitol building and were gathering in a room in the facility.

7.3   These PRPD units gathered in the Capitol building before any citizens had even attempted to exercise their rights to protest the governmental actions described above.

7.4  At about 3:00 PM on June 30, 2010, plaintiff Rachel Hiskes, along with several other journalists from alternative media, including Radio Huelga, IndyMedia, Rumbo Alterno and Onda Alterna, arrived at the Capitol Building.

7.5  Ms. Hiskes' intention was to observe the last day of the legislative session and to report thereon.

7.6  Ms. Hiskes, entered the public building.  When she went into the Capitol, there

14

was no PRPD perimeter around the facility or any other indication that access thereto was prohibited.

7.7  Ms. Hiskes and the other journalists informed the authorities on hand at the Capitol that they were members of the press.

7.8  Ms. Hiskes was never given the opportunity to show her press credentials, which she had with her and which she was prepared to show to officials of the legislature in compliance with the rules regarding access to the chambers.

7.9  Ms. Hiskes, along with the other journalists from alternative media, were prohibited access to the Senate chambers.

7.10  The refusal to allow Ms. Hiskes and the other journalists from alternative media access to the legislative session was based on unlawful viewpoint discrimination. Journalists from traditional media not only were allowed to enter the chambers, but also were present to denounce the refusal to allow access to the journalists from alternative media.

7.11  The only reason for the refusal to allow the group access to the facility, which was at that time open to the public, was because the government of Puerto Rico, and in particular the legislative and PRPD officials and employees involved in the decision, disagreed with their views as citizens regarding the actions of the government.

7.12  Several other persons, including a number of senior citizens, were also prohibited access to the Senate chambers.

7.13  One of the other persons who was prohibited access to the Senate chambers

was the Reverend Juan Ángel Gutiérrez, a representative of the watch group, Amnesty International.

7.14  At no time did Ms. Hiskes or any of the other visitors attempt to enter the chambers without permission.  Rather, they made their request known by speaking to the persons controlling access to the facility.

7.15  Shortly after Ms. Hiskes and the others expressed their interest in observing the Senate proceedings, members of the UOT and/or the Group of 100 who had previously gathered in anticipation of protests at the Capitol, were dispatched to the hallway where Ms. Hiskes and the others were attempting to access the legislative chamber.

7.16  These officers, who are identified with the fictitious name FULANO, in an unlawful and unwarranted act of excessive force, proceeded to strike Ms. Hiskes and the other visitors to the building.

7.17  In response to the unlawful and unjustified action prohibiting their access to a public facility, Ms. Hiskes and three others sat down in the hallway.

7.18  Ms. Hiskes did so in a peaceful demonstration of repudiation of such actions and because of her understanding that the officers had engaged in excessive force against persons who had been peaceful at all times and that the refusal to let her and other citizens observe the legislative proceedings was based on illegal viewpoint discrimination and in violation of a host of other First Amendment protections

7.18 Members of the UOT and/or the Group o 100 responded by striking and pushing Ms. Hiskes and the others, committing unprovoked and illegal actions of

16

aggression against them, while they was peacefully seated in the hallway.

7.19 Defendant José Rohena-Sosa, an employee or contractor of the Senate, proceeded to spray a noxious gas, either pepper spray or some similar agent, at the visitors.

7.20 The spraying of the noxious agent by defendant Rohena-Sosa was an unprovoked act of violence, using undue and excessive force against peaceful citizens who were exercising First Amendment rights, and thoroughly unjustified pursuant to any legitimate function of a legislative aide, whether as an employee or as an independent contractor.

7.21 Ms. Hiskes felt the effects of the noxious agent, making it virtually impossible for her to see, and provoking extreme pain and anguish, as well as a burning sensation over the entirety of her back, as her clothes were drenched with the spray.

7.22 Ms. Hiskes and the others were never given the opportunity to peacefully leave the area without being beaten and sprayed with noxious agents.

7.23 Reverend Gutiérrez was sprayed with the noxious agent directly in his eyes and on other parts of his body, causing him to curl up in a fetal position, rolling in the floor in extraordinary pain and distress. Notwithstanding the minister's obvious condition and his virtual inability to move, the officers continued to assault him.

7.24 Ms. Hiskes attempted to get up from the floor, but she was assaulted by one of the officers identified with the fictitious name FULANO, who hit her in her back with his baton, propelling her across the room.

7.25 Ms. Hiskes also shouted at the officers to stop their aggression against

17

Reverend Gutiérrez.  In response, one of the officers identified with the fictitious name FULANO proceeded to strike her so violently in the arm that she lost her balance and both of her shoes.

7.26   This officer continued to push Ms. Hiskes towards the door, hitting her repeatedly with his baton, despite the fact that the young women was in severe distress, shoeless and virtually unable to see.

7.27  When the officer had managed to push Ms. Hiskes to the door and the top of the exterior steps of the Capitol building, he kept striking her, culminating the violence directed against her by striking her across her neck and literally throwing her down the steps.

7.28 Ms. Hiskes, barely able to maintain her balance, was terrified to the point of being fearful for her life.

7.29 These actions caused Ms. Hiskes severe bruising and pain and muscle aches which continued for a lengthy period of time.

7.30 At the time of the initial assault against Ms. Hiskes, she was peacefully attempting to enter the Senate chamber.  Thereafter, she was assaulted while she was peaceably seated on the floor of the building.

7.31 At the time she was thrown down the Senate steps, Ms. Hiskes did not present any danger or threat to the officers who assaulted her.

7.32 At no time did Rachel Hiskes present any danger or threat to the officers and legislative employee who assaulted her.

7.33  None of the four visitors was ever charged with any offense with respect to these actions.

7.34  The unwarranted and illegal acts of aggression against Ms. Hiskes and the others were observed by an elected member of the House of Representatives, Representative, Carmen Cruz-Soto.

7.35  Representative Cruz-Soto attempted to intervene to prevent the police violence. She showed her legislative identification to the agents, who responded by striking her with their batons and spraying her with noxious gaseous agents.

7.36  Representative Cruz-Soto's arm was badly bruised as a result of police aggression against her, and she forced to seek medical treatment at the infirmary located at the Capitol.

7.37  The aggressions against Ms. Hiskes and the other visitors to the Capitol, which were committed by unidentified agents being named collectively herein by the fictitious name SUTANO, were also observed by members of the media, including a television journalist for a network news program.

7.38  Images of the police violence against these visitors to the Capitol were broadcast on the television news in Puerto Rico and were widely reported in the print and digital media.

7.39  Shortly after the initial group of citizens, including plaintiff Rachel Hiskes, was injured, another group was attacked by members of the PRPD.

7.40  A group of students attempted to deliver a proclamation to the legislature.  The

students peaceably attempted to go up the stairs to the Capitol, but they were met with aggressions and noxious gases.

7.41   Several of these students were hit by police batons by agents delivering blows to their faces, heads or other parts of their bodies.  Several required medical treatment as a result of being assaulted by members of the UOT and/or the Group of 100, including those officers collectively identified herein with the fictitious name FULANO.

7.42   After these events occurred in the mid-afternoon hours of June 30th, thousands of citizens gathered near the Capitol building to protest the legislative action with respect to the situation at the University of Puerto Rico, as well as the closing of the legislative chamber, and the abusive and illegal aggressions earlier that day against Ms. Hiskes and others.

7.43   These citizens, including many elderly persons and young children, gathered peacefully in a rotunda area across from the Capitol steps.

7.44   The rotunda area and other areas adjacent to the Capitol building are public forums where demonstrations take place frequently without incident.

7.45   Citizens present at that time observed a low-flying police helicopter, in which at least one officer was observed with a long-arm weapon.

7.46   Citizens also observed that the PRPD had mobilized the mounted units of the department.

7.47   The prior mobilization of the UOT, the Group of 100, and the mounted units of the PRPD, along with the use of the low-flying helicopter, are further evidence that the

20

supervisory defendants, Figueroa-Sancha, Rosa-Carrasquillo, Mejías and those who are identified herein with the fictitious name SUTANO planned the police riot and the unprovoked assaults on citizens which took place on June 30, 2010.

7.48 A citizen who was on the scene heard an official of the PRPD state words to the effect that "today, blood will flow here."

7.49 Without any provocation, members of the UOT and/or the Group of 100 or other police units began to assault demonstrators indiscriminately, using police batons against them.

7.50   The use of the police batons aggressively against the demonstrators was directly contrary not only to the rights of these citizens pursuant to the Constitutions of the United States and Puerto Rico, but also to General Orders of the PRPD, including General Order 98-6 of July of 1998 and General Order 2010-2.

7.51   Noxious chemical agents were also sprayed over the demonstrators, both through canisters launched against them and through the use of a police helicopter, which sprayed the demonstrators from above.

7.52   The UOT and Group of 100, along with other PRPD officers used the spraying of the noxious agents aggressively in order to disperse peaceful demonstrators who were exercising their rights to peacefully protest at the Capitol, based on the viewpoint of the demonstrators and the fact that they were protesting against Government action.

7.53 It is believed and therefore alleged that defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, as well as other supervisory defendants

identified with the fictitious name SUTANO, approved a protocol pursuant to which the UOT and the Group of 100, as well as other police officers, would advance against the peaceful demonstrators, using batons and noxious agents against citizens, in order to disperse them and prevent them from exercising their First Amendment rights.

7.54  The spraying of the noxious chemical agents was in direct contradiction not only to the rights of these citizens pursuant to the Constitutions of the United States and Puerto Rico, but also to the provisions of General Order 2010-2.

7.55  These "crowd control" measures required planning at the highest level of the PRPD.  It is believed and therefore alleged that defendants Figueroa-Sancha, Rosa-Carrasquillo and Mejías, as well as the other supervisory defendants identified with the fictitious name  of SUTANO, were involved in the planning of the police action that day.

7.56 Independent legal observers attempted to intervene in order to assure that the PRPD officers respected the civil rights of the protesters, but they were repelled by the officers on the scene.

7.57 Although defendant José Figueroa-Sancha was present at the Capitol during the events described herein, he refused to meet with any of the protesters or with the observers or in any way accommodate their interest in carrying out a peaceful protest as do other groups frequently in the areas adjacent to the Capitol.

7.58  Police officers prevented people from assisting other peaceful demonstrators who had been injured in the unwarranted police aggressions.

7.59  Demonstrators were dispersed through the aggressive use of noxious gases,

most without any warning of any kind, in a deliberate and planned effort to prevent them from exercising their right to express their views and to demand redress of grievances.

7.60  The citizens were forced to run into oncoming traffic, often blinded by the effect of the noxious agents which were being delivered both by police officers at the ground level and by those in the helicopter above the crowd.

7.61  At least one police supervisor unholstered his weapon in an unjustified action of intimidation pointed it at demonstrators.

7.62  Plaintiff Omar Silva-Meléndez joined the demonstrators in the late afternoon hours, adding his voice of protest to those who questioned the recent government measures discussed above.

7.61  When he arrived at the Capitol, Mr. Silva observed the UOT and/or Group of 100 in full formation, the mounted unit of the PRPD, and a helicopter flying overhead.

7.62 Mr. Silva also was able to observe that there were police officers on the scene who, contrary to applicable regulations, were not displaying their identification.

7.63 He also observed an officer recording the faces of the protesters with a video camera.

7.64 He also observed and felt the effects of the noxious chemical agents which were being sprayed against the protesters.

7.65  Mr. Silva also saw police officers assaulting several female protesters, causing at least three of them to fall to the ground.

7.66  Mr. Silva tried to assist one of the citizens who had been assaulted by police

officers, attempting to help her gain her footing.

7.67  While he was peaceably protesting these government actions and attempting to assist an injured protestor, Mr. Silva was hit in the forehead by a cannister thrown by a police officer from the UOT or the Group of 100, or from other PRPD units.

7.68  The canister fell to the ground in front of him, continuing to spray noxious gas in his direction.

7.69  The impact of the gas and the canister caused him severe pain and numbness in his legs, impeding him from moving effectively.

7.70   The effect of the gas also caused him severe skin pain and was burning pain to several parts of his bodies, including the groin area.

7.71   Due to the effect of the impact of the canister and the noxious gas, Mr. Silva was left confused and with a sense of helplessness and frustration.  He had difficulty breathing and a choking sensation due to the effects of the gas and was bleeding profusely from the wound on his head.

7.72  Mr. Silva was assisted by other demonstrators who managed to remove him from the scene of the police riot and violence to a waiting ambulance.

7.73 At no time did Mr. Silva represent a threat to authorities.  He was peaceful and engaged in peaceful protest at all times.

7.74 Mr. Silva arrived at the hospital in a state of extreme distress and in severe pain, still feel the effects of the gas in his groin area and legs and severe burning sensation.

7.75 The impact to his forehead provoked second degree burns and required several

24

stitches  under local anaesthesia.

7.76 Defendants Rosa-Carrasquillo and Mejías-Cruz were also present at the Capitol during the events described herein, and it is believed and therefore alleged that defendant Figueroa-Torres, as well as one or more of the defendants identified herein with the fictitious name SUTANO, were there as well.

7.77 Not a single one of the supervisory defendants — defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz, Figueroa-Torres and the defendants identified with the fictitious name SUTANO —   took any action to stop the violent actions which PRPD members took against peaceful protesters.

7.78  Each and every one of the defendants rely on the reputation of the UOT and the Group of 100 for excessive force as a means to intimidate protesters.

7.79 Defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, promote within the UOT and the Group of 100 a culture of confrontation and resort to physical force, in direct disregard for the protections contained in the First, Fourth, Fifth and/or Fourteenth Amendments and the equivalent protections under the Puerto Rico Constitution, with respect to the rights of citizens in general and those of demonstrators in particular.

7.80  Defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, as well as the supervisory defendants identified with the fictitious name SUTANO, employed the UOT and the Group of 100 in the area of the Capitol building on June 30, 2010, and other police units, with full knowledge that these officers would engage in

violent actions against the protesters, employing unlawful and excessive force to prevent a peaceful demonstration.

7.81 After the events at the Capitol on June 30, 2010, defendant Figueroa-Sancha stated that he "assumed full responsibility" for the use of the noxious gases against peaceful demonstrators, stating that through their use, incidents of physical confrontation had been avoided.

7.82 Figueroa-Sancha also warned citizens that if faced with similar protests, his response would be the same — today, tomorrow, next month or next year.

7.83 Defendant Figueroa-Sancha issued that warning in a menacing manner designed to intimidate citizens and to chill future exercises of First Amendment rights by citizens, including the plaintiffs herein.

7.84 Figueroa-Sancha also justified the unprovoked aggressions by officers against peacefully protesting citizens. Before carrying out any investigation of the incident, he stated publicly that the officers had used only that force which was necessary to avoid more violence and to remove the protesters from the area.

7.85 Through their actions and their inactions, the supervisory defendants — Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, along with the other supervisory officers identified herein as FULANO ---- communicated to the PRPD members who were violently assaulting demonstrators that their actions were not only tolerated, but also encouraged by the hierarchy within the PRPD.

7.86 Dozens of citizens were injured at or near the Capitol on June 30th, including

students, journalists, attorneys, professors, observers from international organization and even tourists.  Several citizens had to be treated for injuries at local hospitals.

**The ongoing failure of PRPD to document and punish violence towards citizens and the sense of impunity generated thereby**

8.1  Several of the citizens injured during the above-described events at the Capitol on June 30, 2010 attempted to file administrative complaints against PRPD officers, but the PRPD refused to take their complaints.

8.2  Defendant Figueroa Sancha, as Superintendent, has the power to assure that the right of citizens to file complaints of civil rights violations is protected, but he has failed to do so.

8.3  Defendant Mejías-Cruz, as Commander of the San Juan Area has specific responsibilities in the San Juan Area to assure that citizen complaints in the Area are handled expeditiously and that appropriate sanctions are imposed against errant officers, but he has failed to do so.

8.4   It is common knowledge in Puerto Rico that the administrative complaint system is largely inoperative, with complaints against errant officer lasting years and rarely resulting in appropriate punishment.

8.5  All of the supervisory defendants ----  Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, and the other supervisory officers identified herein as FULANO ---- are aware of the fact that the delays and inefficiencies in the administrative system, along with the lack of effective sanctions against errant officers promotes and

fosters unprovoked violence against citizens by certain police officers.

8.6 It is common knowledge that many of the police officers of the UOT and of other police units purposefully cover up their police badges or have their name tags removed or otherwise hidden, as a means of escaping responsibility for their actions.

8.7 The uniforms and caps used by the UOT are made so that identification tags with each officer's name and badge number are easily removed or otherwise hidden.

8.8 Defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, as well as those other supervisory officers identified with the fictitious name SUTANO, were aware on June 30, 2010 that UOT officers frequently remove their identification before using unlawful force in order to avoid responsibility for their actions.

8.9 On June 30, 2010, many of the offending officers had either removed or hidden their identifying information.

8.10 At that time, an elected Representative of the House of Representatives approached defendant Mejías-Cruz on the scene and specifically identified an officer in his presence who was not properly displaying her required identification.

8.11 Defendant Mejías-Cruz took no action to assure that the rules concerning display of identification were followed that day.

8.12 It is also believed and therefore alleged that although he had been informed of a specific officer who had failed to display her identification, defendant Mejías-Cruz failed to take any action with respect to this matter.

8.13 The comments by the legislator were videotaped that day and broadcast in the

media.

8.14 Despite the fact that an elected Representative had publicly denounced the practice of hiding the agents' identification and had specifically pointed out individual officers who did not display his identification, it is believed and therefore alleged that the supervisory defendants — Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, and those identified with the fictitious name of SUTANO, took no action to identify and/or discipline these agents.

8.15 None of the supervisory officers ----  Figueroa-Sancha,  Rosa-Carrasquillo, Mejías-Cruz, Figueroa-Torres, or the officers identified with the fictitious name SUTANO ---- took any steps to enforce PRPD rules requiring police to display their identifications when in uniform or to assure that officers who violated these rules were subject to appropriate discipline.

8.16 Through their actions and inactions, these supervisory officers encouraged the practice of obscuring the identification of officers, thereby promoting and causing the sense of impunity among UOT, Group of 100, and other PRPD officers who engage in unlawful and excessive force, particularly against persons with whose political views they do not agree.

8.17 After the events of June 30, 2010, although defendant Figueroa-Sancha affirmed that there would be a complete investigation of the police action, it is believed and therefore alleged that there was no such investigation.

8.18 Shortly after the June 30th incidents, a Special Commission of the Puerto Rico

Bar Association was appointed to conduct an investigation of these events.

8.19 On July 8th and 9th, 2010, the Special Commission held hearings concerning the possible violation of constitutional rights in the events of June 30, 2010.

8.20 The Special Commission heard declarations from some two dozen citizens who had been present at the Capitol on June 30, 2010, including three elected Representatives, several attorneys, several students, university professors and a news reporter from a major network television station, most of whom had suffered injuries during the police riot.

8.21 Both of the plaintiffs herein testified at length during the hearings held before the Special Commission of the Puerto Rico Bar Association.

8.22 Although defendant Figueroa-Sancha was invited to appear before the Special Commission, he declined the invitation.

8.23 A preliminary report issued by the Special Commission Bar Association concludes that there were numerous civil rights violations with respect to the events of June 30, 2010.

8.24 The Special Commission issued a series of recommendations to the PRPD.

8.25 Included among the recommendations were that the PRPD immediately commence an investigation to identify the PRPD agents who participated in the violence on June 30, 2010, who engaged in unprovoked assaults against protesters, and those who made use of noxious chemical agents and to proceed to impose disciplinary sanctions which apply to their actions.

8.26 The Special Commission also recommended that disciplinary action be taken

against all of the PRPD officers who failed to properly display their identifications that day, as required.

8.27 The Commission also recommended that the there be an investigation of all orders and instructions by PRPD Superintendent Figueroa-Sancha and other police supervisors, before, during and after the incidents of June 30, 2010, regarding the use of force against demonstrators and with respect to the duty of officers to assist wounded citizens.

8.28 The Commission also recommended that the PRPD identify all UOT officers who were present during the police riot, and that the information be made available to citizens who were injured, in order for them to identify the specific officers who had assaulted them and in order to be able to present administrative complaints with respect to their unlawful actions.

8.29 It also recommended that there be an investigation of the UOT and the Group of 100, how they are recruited and utilized, what their training is and what their purpose is.

8.30 The Commission also called for a review of the disciplinary system in the PRPD, with the purpose of making it more responsive to the need to promote and respect civil rights and so as to punish officers who fail to do so.

8.31 It also recommended review of the policies regarding the use of tear gas, pepper gas or other noxious agents.

8.32 Although the supervisory defendants ---- Figueroa-Sancha, Rosa-Carrasquillo,

Mejías-Cruz and Figueroa-Torres, as well as those identified with the fictitious name SUTANO — know of these recommendations, it is believed and therefore alleged that they have taken no actions to implement any of the measures recommended by the Special Commission of the Puerto Rico Bar Association.

8.33  It is believed and therefore alleged that despite this commitment, only one police officer has been suspended, with pay, as a result of the incidents which occurred on June 30, 2010.

8.34  The officer, who was photographed with his service weapon unholstered and is thought to have fired his weapon that day, was recently promoted to the rank of Lieutenant despite a proven history of prior violence against citizens, with more than two dozen citizen complaints against him in his checkered history with the PRPD.

8.35 Although much of the assault against Ms. Hiskes was captured on videotape by the media, including the moment when she was thrown down the Capitol stairs, it is believed and therefore alleged that no investigation has been carried out in order to identify the officer or officers who used such excessive force against her.

8.36 Although both plaintiffs provided substantial declarations to the Special Commission, it is believed and therefore alleged that no investigation of the assaults against them or the other violations of their civil rights has been conducted.

**Damages and causes of action**

9.1  As a result of the events described herein, plaintiff Rachel Hiskes endured extreme pain and bruising to several parts of her body.  She was horrified and distressed

at seeing bloodied protesters who were trying to escape the police riot and violence, as well as those severely affected by the noxious agents.  Ms. Hiskes was affected by the chemical agents, forcing her to dispose of her clothing.  Her attempts to wash off the agents from her body only caused further pain, stinging and burning.  For a lengthy period of time, she endured bruising and was stricken with crying spells and significant sleep disturbance. She felt totally disillusioned and continues to feel mistrust of authorities and extreme frustration at not being able to exercise the constitutional rights which she was taught and believed she had as a citizen, but due to the exercise of which she was brutally attacked. She has had difficulty resuming her ordinary activities, feeling extremely distressed and depressed.  She had to seek out medical treatment as a result of the events described herein.

9.2 As a result of the events described herein, plaintiff Omar Silva suffered a severe injury to his forehead, resulting in a second degree burn and requiring several stitches.  He also suffered the effects of the noxious chemical agents.  He required immediate emergency medical treatment at a hospital, where he was taken in extreme emotional and physical distress, affected both by the pain, burning and burns which he had received, as well as by his inability to be able to comply with personal obligations and his fear that he would be unable to comply with the planned tour of the musical group Cultura Profética.  His forehead swelled considerably and left a disfiguring scar.  Within hours after he was injured, Mr. Silva had to leave Puerto Rico in order to participate in a multi-country tour in Central America, as part of his obligations with  Cultura Profética.  The transport and

changes in cabin pressure in flight caused him significant pain and distress, as did the sound and tumult at the concerts he participated in over the next few days. At public and press events related to his musical career, he was asked about his injury, due to the obvious, disfiguring scar.  He has had to take medications to avoid infections and has received other medical treatment, incurring in costs related thereto.  Today, although almost six months have passed, Mr. Silva's face is still scarred, a condition which is particularly troubling for an artist who performs in public venues and whose career is closely tied to his image and physical appearance.  He is distressed, has sleep disturbance, intrusive thoughts and other emotional and physical manifestations of the harm done to him by the defendants herein.  When brought into situations in which he must interact with police officers, he is extraordinarily distrustful and on the defensive, with constant reminded of the events of June 30th.

9.3 The actions and omissions of all of the defendants, taken in violation of PRPD rules and regulations and in violation of the most fundamental civil rights of the plaintiffs and the other demonstrators, caused the injuries set forth herein.

9.4 The PRPD defendants collectively identified with the fictitious name FULANO directly injured the plaintiffs herein in their unprovoked assaults against them.

9.5 José Rohena-Sosa also directly injured plaintiff Rachel Hiskes by attacking her with pepper spray or some other noxious agent.

9.6 Defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, and those other PRPD officers identified with the fictitious name SUTANO,

participated in the planning of the police riot which led to plaintiffs' injuries.  They planned and/or observed illegal actions on the part of the PRPD officers on the scene, including unprovoked assaults, the use of noxious chemical agents to disperse lawful protesters, the spraying of such chemical agents from low-flying helicopters, the use of the mounted unit, police actions which forced protesters to run into oncoming traffic endangering their lives, improper use of police batons to the heads and bodies of citizens, and the covering up of the identity of the offenders.   They failed to take any actions to prevent these violations, and in fact, through their public statements, their participation in the planning of the police riot and/or their instructions to officers, actually encouraged, promoted and caused these unlawful acts.

9.7 The above-described actions and omissions on the part of these supervisory defendants, created an environment on the ground at the Capitol on June 30, 2010, which allowed officers to feel free to violate the rights of citizens with impunity, and without any fear that they would be held responsible administratively or criminally for these actions.

9.8 In the period immediately following the incidents of June 30th, defendant Figueroa-Sancha furthered the sense of impunity for unconstitutional actions on the part of PRPD officers, through public statements he made not only justifying the actions without any serious investigation but also promising that future exercises of First Amendment rights by citizens would be responded to with equal violence.

9.9  All of the defendants knew that there was no attempt at the Area Command level or at any of the divisions or units within the PRPD to seriously monitor and/or

investigate incidents of excessive use of force or unconstitutional repression of protests, or to record and analyze such incidents, fomenting a sense of impunity in the officers who were assigned to the Capitol on June 30, 2010.

9.10  The supervisory defendants knew or should have known of the frequency of officers in the PRPD, particularly those in the Tactical Units, using excessive force, as well as the lack of appropriate discipline and the sense of impunity held by officers in the PRPD, due to the overall lack of consequences for known uses of excessive force by officers.

9.11 Pursuant to the policies implemented by defendant Figueroa-Sancha, citizens face significant obstacles in their attempts to take advantage of the disciplinary complaint system.  Pursuant to these policies, officers were often not subject to serious penalties even in those instances in which the allegations of misconduct are sustained in the disciplinary process.

9.12 The policies implemented by defendant Figueroa-Sancha with respect to the disciplinary system serve both to discourage complainants from coming forward and to foment an environment within the PRPD where officers believed they can violate the rights of citizens with impunity.

9.13 The high-level supervisory officers, defendants Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, as well as those defendants identified with the fictitious name SUTANO, knew of  ongoing, specific problems of discipline and violence on the part of many officers in the specialized units such as the UOT and the Group of 100, but have taken no steps to assure that citizens were protected from the

abuses commonly known to occur within these specialized units.

9.14 All of the supervisory defendants, through their omissions and affirmative acts, effectively supported, fomented and encouraged the police violence on June 30, 2010,

9.15 The supervisory defendants — Figueroa-Sancha, Rosa-Carrasquillo, Mejías-Cruz and Figueroa-Torres, and those identified with the fictitious name SUTANO ---- through their prior actions and omissions, as well as through their public and private statements, effectvely communicated to police officers within the PRPD, including those in the UOT and the Group of 100, that there would be no major consequences for an officer who engaged in illegal conduct, including the excessive use of force and/or deadly force against citizens in general and protesters in particular.

9.16 Through their actions and omissions as described herein, the aforementioned supervisory defendants proximately caused the injuries to plaintiffs Omar Silva and Rachel Hiskes.

9.17 The failure of the supervisory defendants to supervise, train and discipline members of the UOT and/or the Group of 100, despite their knowledge of the past incidents involving unlawful use of force by PRPD agents in these units, constitutes reckless and deliberate indifference to the rights of citizens, including the plaintiffs herein, proximately causing their injuries.

9.18 The reliance of these defendants in the use of the "Shock Force" units in response to demonstrations, in conjunction with the failure to enforce rules requiring officers to display their identifications, also proximately caused plaintiffs' injuries.

9.19 All of the defendants conspired with one another in order to facilitate and authorize the use of excessive force on June 30, 2010, in violation of the Constitution and laws of the United States and of Puerto Rico.

9.20 All of the defendants did so with the full knowledge that the identities of the offenders would be hidden from the victims of this violence, that the disciplinary system in the PRPD would not mete out appropriate sanctions, that they would act with complete impunity and that their superiors in the PRPD, up to an including defendant Figueroa-Sancha, would praise them for their actions.

9.21 The above-described acts and omissions of all defendants, and described in the totality of this complaint, were deliberately indifferent to and in reckless disregard of the rights of plaintiffs, and proximately causing the violations of these rights and the damages alleged herein.

9.22  The acts and omissions described herein were wanton and malicious, and they were taken in a manner which abused the authority vested in all of the defendants as officers or agents of the Puerto Rico Police Department, and in the case of defendant Rohena, as an employee or contractor of the Legislature, entitling plaintiffs to an award of punitive and exemplary damages.

9.23 The actions and omissions described herein constitute an excessive use of force, a seizure of plaintiffs, a violation of substantive due process, a failure to provide medical care to persons injured by law enforcement authorities, and violations of the plaintiffs' First Amendment rights and corresponding rights under the Puerto Rico Constitution

comprehended in the concepts of Freedom of the Press, Freedom of Speech, and the right to peacefully protest government action and to demand redress of grievances.

9.24   The defendants respond jointly and severally to the plaintiffs for these violations.

9.25   The actions and omissions described herein entitle the plaintiffs to demand compensatory damages, punitive damages, costs, litigation expenses, interests and attorneys fees pursuant to 42 U.S.C. §1983, and compensatory damages pursuant to Article 1802 of the Civil Code, 31 LPRA §5141.

9.26   This Court has supplemental jurisdiction to hear and adjudicate plaintiffs' federal claims and any Puerto Rico law claims arising from the same nucleus of operative facts, and to hear and adjudicate any such claim this court may deem to be brought on behalf of a pendent party to this action.

**WHEREFORE,** the Plaintiffs request the following relief, jointly and severally, against all defendants:

1. That this court determine that the actions by all defendants were in violation of the Constitution and laws of the United States and of Puerto Rico;

2. That the court award plaintiffs compensatory damages in the amount of no less than $500,000.00 for each of the plaintiffs;

3. That the court award punitive damages in excess of $1,000,000.00

4. That plaintiffs be provided with the costs of this action, as well as statutory attorneys' fees and litigation expenses;

5. That the court provide for payment of all applicable interests, including prejudgment interest if indicated;

6. That plaintiffs be granted such other and further relief as the Court may deem appropriate and proper and  retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

**A jury trial is hereby demanded.**

In San Juan Puerto Rico, this 20th day of December, 2010.

**Respectfully Submitted**

Berkan/Mendez
Calle O'Neill G-11
San Juan, Puerto Rico 00918-2301
Tel.: (787) 764-0814
Fax.: (787)250-0986
bermen@prtc.net

By: _____/s/ Judith Berkan            /s/ Mary Jo Méndez
Judith Berkan                                          Mary Jo Méndez
US DC No. 200803                                 US DC No. 209407
 berkanj@microjuris.com                         mendezmaryjo@microjuris.com